IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:24-cr-137

HASSON JULIAN ROBERTS,

     Defendant.

MEMORANDUM OPINION

This matter is before the Court on the POSITION OF THE DEFENDANT WITH RESPECT TO SENTENCING FACTORS PURSUANT TO 18 U.S.C. § 3553(A), ECF No. 25 ("the OBJECTION"), filed by the Defendant, Hasson Julian Roberts ("Roberts" or "Defendant").

Roberts was convicted of Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and pled guilty to that offense as part of a PLEA AGREEMENT. ECF No. 11. However, before sentencing, Roberts objected to the Probation Office's Presentence Investigation Report, ECF No. 45 ("PSR"), because it recommends imposing a five-point enhancement to his Offense Level for possessing at least 600 "images" of child pornography under U.S.S.G. § 2G2.2(b)(7)(D). ECF No. 25, at 2-4.

Roberts argued that the Court cannot credit the United States Sentencing Commission's ("the Commission") Commentary interpreting that guideline, which considers every "video" of child pornography as counting as seventy-five (75) "images" under the guideline because the text of the guideline is not genuinely ambiguous and because such an interpretation is unreasonable. That argument

follows the decision of the Supreme Court of the United States in Kisor v. Wilkie, 139 S. Ct. 2400, 588 U.S. 558 (2019) and the recent decision of the United States Court of Appeals for the Fourth Circuit in United States v. Boler, 115 F.4th 316 (4th Cir. 2024) addressing the deference owed, and when it is owed, to federal agencies' interpretations of their own regulations, including the Commission's interpretation (in its Commentary) to the United States Sentencing Guidelines ("the Guidelines").

Whether the text of U.S.S.G. § 2G2.2(b)(7) is genuinely ambiguous, or, alternatively, whether the Commission's Commentary interpreting that text is reasonable, are questions of first impression in the Fourth Circuit. The Court agrees with Roberts that the text of the Guideline enhancement, U.S.S.G. § 2G2.2(b)(7), is not genuinely ambiguous and, therefore, that there is no reason to rely on the Commentary. Alternatively, if the Guideline is considered to be ambiguous, the Commentary interpreting that text is unreasonable. Therefore, for the reasons set forth below, the OBJECTION, ECF No. 25, at 2-4, was SUSTAINED.

### I. FACTUAL BACKGROUND

### A. OFFENSE HISTORY

In November 2020, FBI agents were informed that a user by the name of "boredani" on the KIK Messenger internet application was sharing videos purportedly of child pornography. PSR ¶ 9. They were able to track the IP address used by boredani to a Verizon

2

Wireless user and found that user's telephone number. Roberts was identified as the Verizon Wireless subscriber and the KIK Messenger accountholder known as boredani. Id. The law enforcement agents then obtained and executed a search warrant at Roberts' residence on December 8, 2021. They seized various electronic devices, including external hard drives. Id. Subsequent forensic examinations of those devices revealed 13 pictures and 127 videos of child pornography. Id. ¶ 12. The longest video found was 11 minutes and 20 seconds and recorded a prepubescent minor female who was engaged in, and subjected to, various sexual acts. Id. ¶ 9.

Various minor children were depicted in the the 140 items of child pornography that Roberts possessed. At least seven of those minor victims submitted victim impact statements, ECF No. 45-2, and claimed restitution against Roberts for the continuing harms that they face—now, typically as adults—due to his, and others', possession and viewing of their abuse.

### B. PROCEDURAL HISTORY

Following his arrest, Roberts pled guilty to one count of Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). ECF No. 11. The Probation Officer filed the initial

PSR on December 20, 2024.[1] The PSR calculated Roberts' Base Offense Level at 18. However, that level was enhanced to 33 after several Guidelines enhancements were applied, including the five-point enhancement for possessing 600 or more images of child pornography pursuant to U.S.S.G. § 2G2.2(b)(7)(D).[2] PSR ¶¶ 18-23. It was then decreased by three points because Roberts accepted responsibility for his offense conduct and assisted law enforcement in their investigation. Id. ¶¶ 29-31. Roberts had no previous criminal history, so his Criminal History Category was I. Id. ¶¶ 32-38. After combining the Offense Level of 30 and Criminal History Category of I, the PSR calculated the sentencing guidelines range for imprisonment to be from 97 to 120 months.[3] PSR ¶ 58.

Roberts lodged three objections to the PSR. First, he objected to including the victim impact statements as attachments to the PSR. ECF No. 45, at 20. Second, he objected to the PSR's application of a two-point enhancement to his Offense Level for

---

[1] The PSR has been amended and refiled three additional times since its initial filing. ECF Nos. 19, 29, 45. However, none of those amendments materially implicate the relevant OBJECTION. Any references to the PSR throughout this MEMORANDUM OPINION are to the most recent version, ECF No. 45.

[2] The Court refers to U.S.S.G. § 2G2.2(b)(7) as the "image enhancement" hereafter.

[3] The typical sentencing guidelines range for an individual with this Offense Level and Criminal History Category is 97 to 121 months; however, the statute restricts a potential sentence of incarceration to a maximum of 10 years (120 months). 18 U.S.C. § 2252A(b)(2).

his use of a computer during the possession of child pornography pursuant to U.S.S.G. § 2G2.2(b)(6). ECF No. 25, at 2. Third, he objected to the PSR's application of the five-point image enhancement. Id. at 2-4. The Probation Officer contended that the enhancements "were properly applied based on the offense conduct described in the [PSR]." ECF No. 45, at 21. The United States contested all three objections and urged the Court to overrule them. ECF No. 26.

On March 27, 2025, the Court held an initial Sentencing Hearing for Roberts. At that Hearing, the Court heard oral argument on Roberts' objection to the two-point computer-use enhancement and the five-point image enhancement. During oral argument, Roberts withdrew his objection to the two-point computer-use enhancement, deciding instead to incorporate that argument into his motion for downward variance. ECF NO. 33. The Court deferred ruling on the image-enhancement objection at the time and ORDERED additional briefing to more fully consider whether applying the five-point image enhancement to Roberts was appropriate. The Court CONTINUED the Hearing to provide the parties with additional time to submit that briefing. ECF No. 34.

The Court held a second Sentencing Hearing on Monday, June 2, 2025, to consider the MOTION OF THE UNITED STATES FOR DOWNWARD VARIANCE, ECF No. 22, Roberts' MOTION FOR DOWNWARD VARIANCE FROM SENTENCING GUIDELINES FOR OVERSTATEMENT OF OFFENSE CHARACTERISTICS

ASSIGNED, ECF No. 24, the parties' jointly proposed restitution amount, and the remaining objections regarding the victim impact statements and the five-point image enhancement. In anticipation of that second Sentencing Hearing, the parties submitted multiple supplemental briefs on the outstanding issues for the Court's consideration. ECF Nos. 35, 36, 37, 38, 39, 40, 41, 42, 43, 44. In the interim, the parties also submitted a joint proposal that Roberts would pay $27,000.00 in restitution to the seven victims that sought restitution, ECF No. 46, which the Court adopted. ECF No. 51.

At the outset of the second Sentencing Hearing, the Court OVERRULED Roberts' unsupported objection to the inclusion of the victim impact statements as attachments to the PSR because Roberts failed to present an argument supporting that objection.[4] It also

---

[4] When defendants do not present any reasons for their objections to factual allegations in, including attachments to, the PSR, the objection is not colorable and should be overruled. See United States v. Flores, 733 Fed. App'x 89, 91 (4th Cir. 2018) (per curiam) (unpublished) ("[The defendant's] objections amounted to not much more than general denials of the conduct alleged [in the PSR]. Because [the defendant] failed to offer any evidence or argument to demonstrate that the information was unreliable or inaccurate, the district court was 'free to adopt the findings of the presentence report without more specific inquiry or explanation.'" (quoting United States v. Terry, 916 F.2d 157, 162 (4th Cir. 1990) ("A mere objection to the finding in the presentence report is not sufficient. The defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." (internal quotation marks and alteration omitted))).

SUSTAINED Roberts' OBJECTION to the PSR's application of the five-point image enhancement, and, instead, held that only the two-point version of the image enhancement applied based on the number of "images" of child pornography in Roberts' possession. Based on this holding, Roberts' Offense Level reduced from 30 as originally calculated in the PSR to 27. When combined with Roberts' Criminal History Category of I, this lowered Roberts' sentencing guidelines range from 97 to 120 months to 70 to 87 months.

Following the Court's rulings on Roberts' objections, the United States withdrew its downward variance motion, ECF No. 22, and instead argued that Roberts should receive a sentence within the newly calculated sentencing guidelines range of 70 to 87 months. Roberts maintained that the Court should grant his own downward variance motion. After hearing oral argument on the remaining downward variance motion, the Court granted Roberts' motion for downward variance, ECF No. 24, and imposed a sentence of 40 months incarceration to be followed by five years of supervised release. ECF No. 49. This MEMORANDUM OPINION explains the reasons for the decision sustaining Roberts' objection to the five-point enhancement based on U.S.S.G. § 2G2.2(b)(7)(D).

## II. DISCUSSION

Although this matter is before the Court on the Defendant's OBJECTION, the United States has the burden to prove, by a preponderance of the evidence, that the Guidelines' image

7

enhancement should apply to Roberts. United States v. Reyna, 336 Fed. App'x 353, 354 (4th Cir. 2009) (per curiam) (unpublished) (citing United States v. Kiulin, 360 F.3d 456, 460 (4th Cir. 2004)).

Section 2252A of Title 18 of the United States Code criminalizes the possession of child pornography when possessed knowingly. 18 U.S.C. § 2252A(a)(5)(B). Pursuant to that statutory authority, the Guidelines assign offenders an Offense Level of 18, which can be augmented by various "enhancements" depending on certain additional or aggravating factors accompanying the underlying possession offense. U.S.S.G. § 2G2.2(a)(1). The enhancement at issue today is U.S.S.G. § 2G2.2(b)(7), which is known as the image enhancement or, colloquially, as the "image table." It provides as follows:

> If the offense [Possessing Material Involving the Sexual Exploitation of a Minor] involved—
>
> (A) at least 10 images, but fewer than 150, increase [the Offense Level] by 2 levels;
> (B) at least 150 images, but fewer than 300, increase by 3 levels;
> (C) at least 300 images, but fewer than 600, increase by 4 levels; and
> (D) 600 or more images, increase by 5 levels.

Id. § 2G2.2(b)(7)(A)-(D) (emphasis added). The Commission also promulgates "Commentary" for the guidelines and enhancements. That Commentary provides greater insight into the meaning of

8

enhancements. As relevant here, the Commission promulgated the following Commentary to interpret the image enhancement:

> **(A) Definition of "Images".—***Images* means any visual depiction, as defined in 18 U.S.C. § 2256(5), that constitutes child pornography, as defined in 18 U.S.C. § 2256(8).
>
> **(B) Determining the Number of Images.**—For purposes of determining the number of images under subsection (b)(7):
>
>> (i) Each <u>photograph</u>, picture, computer or computer-generated image, or any similar visual depiction <u>shall be considered to be one image</u>. If the number of images substantially underrepresents the number of minors depicted, an upward departure may be warranted.
>>
>> (ii) Each <u>video</u>, video-clip, movie, or similar visual depiction <u>shall be considered to have 75 images</u>. If the length of the visual depiction is substantially more than 5 minutes, an upward departure may be warranted.

U.S.S.G. § 2G2.2(b)(7) Comment., n.6(A)-(B)(i)-(ii) (emphasis added). Particularly relevant for today's case is the portion of the Commentary that interprets the enhancement's application in the video context—meaning, when a defendant possesses a video of child pornography. That comment, also known as the "75:1 Rule," states that each "video" (or similar medium) of child pornography counts as seventy-five (75) "images" for purposes of the enhancement. <u>Id.</u> § 2G2.2(b)(7) Comment., n.6(B)(ii). Therefore, if an offender possesses one video of child pornography, the Commentary calculates that the offender actually possesses 75 "images" of child pornography, which automatically triggers the

9

first level (two-point enhancement) of the image table (for possession of between 10 to 149 images).

Roberts possessed 13 pictures and 127 videos of child pornography. The 13 pictures constitute 13 "images" of child pornography. That is not, and could not reasonably come under, dispute. As for the 127 videos of child pornography in Roberts' possession, each video, pursuant to the Commentary of the enhancement, constitutes 75 images under the enhancement. Under that multiplier, the 127 videos in Roberts' possession totals 9,525 "images" of child pornography, and, when combined with the 13 pictures of child pornography, that number increases to an overall total of 9,538 "images" of child pornography for the purposes of the image enhancement. Having possessed over 9,000 "images" of child pornography, the five-point version of the image enhancement applies to Roberts. And so, the PSR applied it.

The 75:1 ratio is an interesting one. The Commentary does not identify the source of the ratio. Nor does the Commentary describe the reasoning that led the Commission to settle upon the ratio. Quite obviously, the text of the enhancement itself does not create that ratio—rendering the Commentary (seemingly) necessary in the first instance. Nonetheless, in application, the ratio, and its origins, matters a great deal. Take the following examples. An individual may possess nine (9) photographs of child pornography that show in vivid detail horrendous abusive acts perpetrated

10

against minor children, and yet, that possessor will not receive the enhancement. Another individual may possess a single video of child pornography that is less than a single second in duration (around, or perhaps less than, a blink of an eye), and, because of the 75:1 Rule, that individual would receive the two-point enhancement. If that same individual possesses two such videos, he would receive the three-point enhancement. Four videos? The four-point enhancement applies. Possessing six videos (or more) triggers the highest level: a five-point enhancement. An individual could possess six videos, which cumulatively total mere seconds in duration, and the five-point version of the enhancement would apply. All of this because of the Commission's interpretation of a single word: "image."

Because of the way that the enhancement, and the Commentary interpreting it, is written, the substantive content of these "images" is not brought into play in applying the enhancement. The duration of the video does not matter. The nature of the abuse depicted therein does not matter—regardless of its depravity or brutality. Neither the number of minor victims nor the number of abusers depicted therein matters. A single video triggers the enhancement. Increase that number by just a few and a defendant can expect a five-point enhancement that adds years to the incarceration component of the sentence.

So, the consequences are quite severe for defendants who face the application of the image enhancement. Indeed, whether the image enhancement applies, and, if so, which level thereof, could mean years of additional incarceration, or freedom. That is the case for Roberts: With 127 videos in his possession, the PSR applied the five-point enhancement to him.

That need not be the state of affairs, however. For example, if, instead of the 75:1 ratio, the enhancement applied equally to videos as it does to pictures or photographs—_i.e._, if a single video constitutes a single image of child pornography, just as a single picture constitutes a single image of child pornography— then far more variation in when the enhancement applies would likely result. Roberts' case illustrates the example.

If each of the 127 videos of child pornography in Roberts' possession counts as a single image for purposes of the enhancement, instead of 75 images pursuant to the 75:1 ratio, then, when combined with the 13 pictures of child pornography in his possession, Roberts would have possessed a total of 140 "images" rather than 9,538. That would make the five-point enhancement inapplicable and, instead, trigger only the two-point enhancement for possession of between 10 to 149 images of child pornography. U.S.S.G. § 2G2.2(b)(7)(A). In that event, Roberts' sentencing guidelines range would be reduced from 97 to 120 months to 70 to 87 months.

Or, as some courts have decided when applying the image enhancement in the video context, the term "image" may actually constitute every individual "frame" within a video. E.g., United States v. Haggerty, 107 F.4th 175, 178 (3d Cir. 2024); United States v. Debus, 688 F. Supp. 3d 201, 214-15 (M.D. Pa. 2023). With the advent of modern digital video technology, a single video of mere seconds may contain thousands of "frames." Pursuant to the "frame" interpretation, then, a defendant who possesses a single video may possess thousands of images for purposes of the enhancement because that one video contains thousands of frames. Debus, 688 F. Supp. 3d at 217. Consequently, that defendant may have possessed only one video, but, nonetheless, would receive the five-point enhancement because the video contains thousands of frames each of which would constitute a single image (placing that defendant far past the five-point enhancement's 600-image threshold).

Therein lies the issue. Much depends on the meaning of the term "image" in the enhancement and whether the Court can, or should, credit the Commission's Commentary in interpreting that term's meaning. Hence: Roberts' objection.

The nature of that objection, on its face, however, is somewhat muddled. For example, in his papers, as well as during oral argument at the first Sentencing Hearing, Roberts' counsel seemed to be making an argument that the image enhancement,

U.S.S.G. § 2G2.2(b)(7), improperly interpreted the statute proscribing the offense conduct, 18 U.S.C. § 2252A. E.g., ECF No. 25, at 2-4. So, Roberts argues, at several points, how the Supreme Court's recent decision in Loper Bright Enters. v. Raimondo, 144 S. Ct. 2244, 603 U.S. 369 (2024), which overruled the longstanding doctrine known as Chevron[5] deference that courts gave to agencies' interpretations of statutes, renders the image enhancement and the Commentary as unpersuasive and as regulations to which the Court should not defer. ECF No. 25, at 2-3; ECF No. 38, at 2-3. He argues that Congress spoke unambiguously in the statute, 18 U.S.C. § 2252A; id. § 2256, in describing what "images" meant, and, therefore, that the Court cannot defer to the Commentary's interpretation (the 75:1 ratio) of that statute. ECF No. 38, at 2-3. However, as part of his discussion, Roberts also discusses the Supreme Court's decision in Stinson v. United States, 508 U.S. 36 (1993) and the Fourth Circuit's decision in United States v. Campbell, 22 F.4th 438 (4th Cir. 2022), both of which dealt with when, and to what extent, courts should defer to the Commission's interpretations of the Guidelines (and enhancements) themselves rather than its interpretations of statutes. He also notes that the deference standard established by the Supreme Court in Kisor v. Wilkie, 588 U.S. 558, which instructs courts to defer to

---

[5] Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).

agencies' reasonable interpretations of their own regulations, as being implicated.

Notwithstanding the somewhat confusing nature of Roberts' argument, it appears now (after extensive briefing) that Roberts is not objecting to the Guidelines as they interpret the statute but, instead, to the 75:1 ratio established by the Commission in the Commentary. His reasoning seems to be that the text of the Guidelines, specifically, the term "image" in the image enhancement, is not genuinely ambiguous; that the text does not indicate that a single video constitutes seventy-five images; and that the Commentary establishing the 75:1 ratio is an unreasonable interpretation of the enhancement's language.

Although Roberts makes reference to, and relies on, Loper Bright for part of his argument, his objection instead actually relies on a different, though substantially related, set of caselaw, namely, the Supreme Court's decisions in Stinson and Kisor and the Fourth Circuit's recent decision in United States v. Boler, 115 F.4th 316.

Loper Bright addressed when courts should defer to agency regulations that interpreted the text of congressionally enacted statutes. In that case, the Supreme Court overruled the decision in Chevron, which had held that courts should defer to agency interpretations of statutes (e.g., the agencies' regulations) when those regulations were reasonable. Loper Bright, 144 S. Ct. at

15

2273. In 2019, years before it ruled on Loper Bright, however, the Supreme Court issued its decision in Kisor, which extended the Chevron deference principle to agency interpretations of their own regulations. Kisor, 588 U.S. at 574-76. So, while courts no longer necessarily need defer to agencies' reasonable interpretations (regulations) of statutory text pursuant to Loper Bright, 144 S. Ct. at 2273, they should still defer to agencies' reasonable interpretations of their own regulations. Kisor, 588 U.S. at 575-76.[6]

The Sentencing Guidelines themselves operate in a unique sphere when it comes to these doctrines of judicial deference. In 1993, the Supreme Court decided Stinson v. United States, which held that the Commission's Commentary that interprets the meaning of the guidelines and enhancements is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson, 508 U.S. at 38. Following the decision in Kisor, circuit courts split on the question of whether to continue following the Stinson

---

[6] Some scholars argue the contrary, believing that Loper Bright abrogated Kisor and rendered it no longer good law. See, e.g., Thomas E. Nielsen & Krista A. Stapleford, What Loper Bright Might Portend for Auer Deference, Harv. L. Rev. Blog (July 5, 2024), https://harvardlawreview.org/blog/2024/07/what-loper-bright-might-portend-for-auer-deference/. The Fourth Circuit has clearly disagreed with that interpretation of Loper Bright, however, at least as it relates to the Guidelines, as seen in Boler. Boler, 115 F.4th at 322 n.4.

approach, or to adopt Kisor's approach for interpreting the Guidelines. Compare Boler, 115 F.4th at 322 (holding that Kisor abrogated Stinson's approach to judicial interpretation of the Guidelines and adopting Kisor's standard of interpretation thereto), with United States v. Pratt, No. 20-10328, 2021 U.S. App. LEXIS 37022, at *6-7 (9th Cir. Dec. 15, 2021) (mem.) (unpublished) (holding that the Stinson standard for interpreting the guidelines remains good law and rejecting that Kisor abrogated that approach). Loper Bright stirred the controversy anew, with the circuit courts again having to decide whether, in its wake, Kisor remained good law. As to that question, the Fourth Circuit answered in the affirmative.

In United States v. Boler, a decision reached after Loper Bright, the Fourth Circuit explicitly adopted Kisor's approach to interpreting the Guidelines. Boler, 115 F.4th at 322. In doing so, it rejected the view that Loper Bright had abrogated Kisor because "Loper Bright dealt specifically with ambiguities in statutory directives to agencies and did not address the issue of agency interpretations of their own regulations." Id. at 322 n.4. Therefore, pursuant to Boler, the Court must apply Kisor's standard when deciding whether the Commentary to U.S.S.G. § 2G2.2(b)(7) is an appropriate interpretation of the image enhancement's language.

According to the Kisor and Boler standard, the Court should only defer to the Commission's interpretation of the image

enhancement in the Commentary (the 75:1 Rule) if the text of the image enhancement is "genuinely ambiguous" after using "all the standard tools of interpretation" in the Court's toolbox to examine that text. Kisor, 588 U.S. at 573, 575; Boler, 115 F.4th at 322-23. In its inquiry, the Court "must carefully consider the text, structure, history, and purpose" of the enhancement "in all the ways it would if it had no agency to fall back on." Kisor, 588 U.S. at 575; Boler, 115 F.4th at 335.

If the text of the enhancement is not genuinely ambiguous, then the Court must state that unambiguous meaning and apply the enhancement accordingly. The Court cannot look to the Commission's Commentary interpreting the enhancement in its review or application.

However, if the enhancement's text is genuinely ambiguous, then the Court must proceed to Kisor and Boler's second analytical step, pursuant to which (after determining that the enhancement's text itself is genuinely ambiguous), the Court then assesses whether the Commission's Commentary, which interprets the meaning of that ambiguous text, is within the "zone of ambiguity" such that it falls "within the bounds of reasonable interpretation." Kisor, 588 U.S. at 575-76 (quoting Arlington v. FCC, 569 U.S. 290, 296 (2013)); Boler, 115 F.4th at 323. If the Commentary's interpretation is an unreasonable one, then the Court should not defer to it. Not all reasonable interpretations warrant Kisor

deference, however. Kisor, 588 U.S. at 576-77; Boler, 115 F.4th at 323. If the Commentary's interpretation is reasonable, one analytical step remains before the Court may defer to the Commentary.

At Kisor and Boler's third step, the Court must only defer to reasonable interpretations in the Commentary "that Congress would have wanted" based on an "independent inquiry into whether the character and context of the [Commission's] interpretation entitles it to controlling weight." Kisor, 588 U.S. at 576; Boler, 115 F.4th at 323. To determine if the "character and context" of the interpretation warrants judicial deference, the Court must determine whether: (1) the interpretation is the "official position" of the Commission; (2) the interpretation implicates the Commission's "substantive expertise"; and (3) the interpretation reflects the "fair and considered judgment" of the Commission. Id. at 2416-17. If the Court finds that those three factors are met, then deference to the interpretive Commentary is warranted.

For its part, the United States contends that the term "image" is genuinely ambiguous when considered in the video context. ECF No. 26, at 4. Its argument relies on three contentions: (1) that the enhancement's text itself does not define the term "image"; (2) that the "purpose of the guideline provision is to enhance punishment based on the number of images possessed by an offender," which makes it "nonsensical to ignore videos possessed by a

19

defendant"; and (3) that two circuit courts have held that the term is genuinely ambiguous. Id. (citing United States v. Peralta, No. 23-13647, 2024 U.S. App. LEXIS 27422, 2024 WL 4603297, at *2 (11th Cir. Oct. 29, 2024) (per curiam) (unpublished); United States v. Phillips, 54 F.4th 374, 379 (6th Cir. 2022)). Because, in its view, the text is genuinely ambiguous, the United States argues that the Court can look to the Commentary's interpretation, which it views as a reasonable. Id. Lastly, the United States contends that the character and context of the interpretive Commentary is of such that it is entitled to controlling weight and deference should be afforded thereto. Id. Upon further inquiry by the Court, however, the United States could provide little detail into the origins of the 75:1 Rule or the reasoning for its adoption aside from what has already been stated by other circuit courts of appeals. See generally ECF No. 35, at 2-3.

Whether the term "image" in U.S.S.G. § 2G2.2(b)(7) is genuinely ambiguous is one of first impression in the Fourth Circuit. However, the answer to that question is at much dispute among the other circuit courts.

On one hand, and as the United States notes, the United States Court of Appeals for the Sixth Circuit and the United States Court of Appeals for the Eleventh Circuit have both held that the term "image" is genuinely ambiguous. Phillips, 54 F.4th at 379; Peralta, 2024 WL 4603297, at *2; United States v. Carmody, Nos. 22-13539,

22-13542, 2023 U.S. App. LEXIS 28315, at *5 (11th Cir. Oct. 25, 2023) (per curiam) (unpublished); United States v. Vandyke, Nos. 23-11268, 23-11794, 2024 U.S. App. LEXIS 3017, 2024 WL 505080, at *3 (11th Cir. Feb. 9, 2024) (per curiam) (unpublished); United States v. Blanc, No. 22-14128, 2025 U.S. App. LEXIS 7063, at *20-21 (11th Cir. Mar. 27, 2025) (per curiam) (unpublished).[7] Subsequently, both courts looked to the Commentary for guidance in their interpretations of the enhancement's meaning. Both found that the 75:1 ratio in the Commentary was reasonable and deferred to it. Phillips, 54 F.4th at 384-86; e.g., Blanc, 2025 U.S. App. LEXIS 7063, at *20-21.

On the other side of the circuit split resides the United States Court of Appeals for the Third Circuit and a concurring opinion by Judge Larsen of the Sixth Circuit in the Phillips decision. See also Debus, 688 F. Supp. 3d 201. The Third Circuit has held that the term "image" in the enhancement is not genuinely ambiguous. Haggerty, 107 F.4th at 183. Judge Larsen in the Sixth Circuit contends the same. Phillips, 54 F.4th at 386 (Larsen, J.,

---

[7] The United States Court of Appeals for the Ninth Circuit has also held that the term "image" is genuinely ambiguous. Pratt, 2021 U.S. App. LEXIS 37022, at *7. However, the Ninth Circuit does not follow the Kisor approach; instead, it maintains the Stinson approach to interpreting the text of the Guidelines and its enhancements. Consequently, because the Fourth Circuit has chosen to abandon Stinson in favor of the Kisor approach, Boler, 115 F.4th at 322-23, the Ninth Circuit's decision does not help the analysis here.

concurring in judgment). After concluding that the text was not genuinely ambiguous, both the Third Circuit and Judge Larsen concluded that, in the video context, the term "image" means "frame" such that each individual "frame" in a video constitutes a single "image" for purposes of the enhancement. Haggerty, 107 F.4th at 183; Phillips, 54 F.4th at 386 (Larsen, J., concurring in judgment).

In each of those decisions, the defendants proposed a common argument on how to interpret the term "image" in the enhancement: In the video context, the term "image" simply and unambiguously means a single video just as it means a single picture or photograph. In each case, the court (and Judge Larsen) rejected that argument. Phillips, 54 F.4th at 381-82 (majority opinion); id. at 392 (Larsen, J., concurring in judgment); Haggerty, 107 F.4th at 183; Vandyke, 2024 U.S. App. LEXIS 3017, at *4, *10-11. Unlike the defendants in any of those cases, Roberts contends that the enhancement's text is not genuinely ambiguous, he does not provide any thoughts on what the term "image" means or any interpretation of that language for the Court's consideration.

With this background in mind and cognizant of the varied opinions of the Third, Sixth, and Eleventh circuits, the Court examines anew the text of U.S.S.G. § 2G2.2(b)(7). It does so pursuant to the framework set out by the Supreme Court in Kisor decision and adopted by the Fourth Circuit in Boler. The Court has

found no decision by the Fourth Circuit or from any district court within its jurisdiction that addresses the necessary questions that those cases require for an examination of the image enhancement: (1) Is the term "image" genuinely ambiguous?; (2) If not, what is its unambiguous meaning?; (3) If so, is the Commentary interpreting that text reasonable?; and (4) If reasonable, does the Commentary deserve deference? Consequently, the question is one of first impression in this circuit. The analysis of those questions, as instructed by Boler, is set forth below.

## III. ANALYSIS

The core question is whether the term "image" in the text of the Guideline image enhancement, U.S.S.G. § 2G2.2(b)(7), is genuinely ambiguous. Kisor, 588 U.S. at 573; Boler, 115 F.4th at 322-23. After considering the text, structure, history, and purpose of the text, the Court holds that the term "image" is not genuinely ambiguous. Consequently, the Court need not undertake the secondary inquiry into whether the Commentary's 75:1 ratio is a reasonable interpretation of the text. Ordinarily, it is preferable to articulate a single basis for decision, and, conversely, to refrain from making alternative holdings. Karsten v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc., 36 F.3d 8, 11-12 (4th Cir. 1994). However, because several circuit courts have arrived at different conclusions when conducting a Kisor analysis for this enhancement, and because it is a question of

first impression in the Fourth Circuit, the Court finds it appropriate also to address whether the Commission's 75:1 ratio in the Commentary is a reasonable interpretation of the image enhancement's text that would warrant judicial deference if the Court had determined that the term "image" was genuinely ambiguous. As to that second question, the Court finds that the Commentary's 75:1 Rule is an unreasonable interpretation of the image enhancement's text that does not warrant judicial deference. Therefore, the Court does not defer to the Commission's interpretive Commentary of the term "image" and would not defer to that interpretation even if it had found that the term "image" was genuinely ambiguous. As Kisor and Boler direct, these analytical questions are taken in turn.

## A. The Term "Image" in the Text of U.S.S.G. § 2G2.2(b)(7) Is Not Genuinely Ambiguous.

The first task is to assess whether the term "image," as used in the image enhancement, is genuinely ambiguous. To that end, the Court uses all the traditional tools at its disposal "in all the ways it would if it had no agency to fall back on" to determine if the "text, structure, history, and purpose" of the enhancement supports the conclusion that the text is genuinely ambiguous or not. Kisor, 588 U.S. at 575; Boler, 115 F.4th at 335.

We begin with the text. The text of the enhancement reads as follows:

24

> If the offense [Possessing Material Involving the Sexual Exploitation of a Minor] involved—
>
> (A) at least 10 images, but fewer than 150, increase by 2 levels;
> (B) at least 150 images, but fewer than 300, increase by 3 levels;
> (C) at least 300 images, but fewer than 600, increase by 4 levels; and
> (D) 600 or more images, increase by 5 levels.

U.S.S.G. § 2G2.2(b)(7)(A)-(D) (emphasis added). Other than a single use of the phrase "digital images" in § 2G3.1(b)(2), this is the only place where the Guidelines themselves—excluding the Commentary—uses the term "images."[8] Neither the Guidelines nor the enhancement itself provides a definition for the term "images."

Typically, when a term is not defined in the text, courts must endeavor to "accord the term its 'ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import.'" Teshome-Gebreegziabher v. Mukasey, 528 F.3d 330, 332 (4th Cir. 2008) (quoting DIRECTV, Inc. v. Nicholas, 403 F.3d 223, 225 (4th Cir. 2005) (alteration in original)). This principle applies when courts examine the Sentencing Guidelines. Boler, 115 F.4th at 323 (citing United States v. Haas, 986 F.3d 467, 480 (4th Cir. 2021)). And, in assessing the ordinary, contemporary common meaning, it is

---

[8] Similarly, nowhere in the Guidelines themselves—excluding the Commentary—do the terms "video," "frame" (aside from "time frame"), "picture," or "photograph" appear. See generally U.S.S.G. § 2G.

customary to turn to dictionaries for assistance. Id. at 324; Nat'l Coal. for Students with Disabilities Educ. and Legal Def. Fund v. Allen, 152 F.4d 283, 288-89 (4th Cir. 1998).

Before turning straight to dictionary definitions, however, it is important to note the uniqueness of the image enhancement at issue today. Unlike the vast majority of the Guidelines, the Commission inserted the image table, verbatim, into the Guidelines pursuant to a congressional directive. PROTECT Act, Pub. L. No. 108-21, 117 Stat. 650, 673 (2003). That table was part of legislation known as the PROTECT Act, which codified anew the crime at issue today: possession of child pornography. 18 U.S.C. § 2252A(a)(5)(B). That Act also codified specific statutory definitions for terms of art used throughout its code. Id. § 2256.[9] Because the image table came directly from Congress, and was embedded within this larger statutory framework, it is appropriate to begin the search for the meaning of the term "images" as used in the image enhancement with an examination of the statutory text. See Mukasey, 528 F.3d at 332 (noting, in the statutory interpretation context, that courts should only look to the common meaning of an undefined statutory term "absent an indication

_____

[9] To the Commission's credit, it looked to the same statutory language in its Commentary when it provided its interpretation of the term "image." U.S.S.G. § 2G2.2(b)(7) Comment., n.6(A) (citing 18 U.S.C. § 2256(5), (8)).

Congress intended [it] to bear some different import" (alteration in original)).

The text of the statute confirms that one "image," as used in the image enhancement, unambiguously means one picture, one photograph, or the entirety of one video. The statute for the present offense criminalizes "knowingly possess[ing], or knowingly access[ing] with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography." 18 U.S.C. § 2252A(a)(5)(B) (emphasis added). This portion of the statute provides helpful insight into what Congress does not consider to be an image of child pornography, but, instead, what it considers to "contain" images. So, for example, it is clear that an entire book or an entire videotape is not one "image" for the purposes of the image enhancement, but that those media may contain one or more images within their domain (e.g., multiple pictures within a book or multiple videos within a videotape).

The phrase "child pornography" used in the text to define the criminal conduct is itself a term of art defined in 18 U.S.C. § 2256(8). Specifically, "child pornography" means "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture . . . of sexually explicit conduct, where—such visual depiction is a digital image, computer image, or computer-generated image." Id. 18 U.S.C. §

27

2256(8)(B) (emphasis added). "Visual depiction" is another term of art, which "includes undeveloped film and videotape, data stored on computer disk or by electronic means <u>which is capable of conversion into a visual image and data which is capable of conversion into a visual image</u> that has been transmitted by any means . . ." <u>Id.</u> § 2256(5) (emphasis added).

What can be gleaned from these definitions? First, "visual depiction" certainly means more than just "image." Just like the definition for criminal possession, the definition of "visual depiction" includes some items that <u>contain</u> images such as undeveloped "videotape." <u>Compare id.</u> § 2252A(a)(5)(B), <u>with id.</u> § 2256(5). It also encompasses <u>data</u> capable of conversion into "digital images." <u>Id.</u> § 2256(5). So, visual depiction itself is not always or exactly synonymous with the term "image."

However, secondly, Congress did define in greater detail what it meant by "visual depiction" in the rest the statute. Specifically, visual depictions of child pornography are not only data or media that <u>contain</u> "digital images" of that pornography but are themselves also photographs, films, videos, pictures, or computer-generated images of child pornography. <u>Id.</u> § 2256(8). In those situations, "such visual depiction[s are] <u>digital image[s], computer image[s], or computer-generated image[s]</u>." <u>Id.</u> (emphasis added).

28

So, Congress stated in the statute that visual depictions can be both data or other media that <u>contain</u> images of child pornography. But, it also told us that visual depictions can be the very <u>pictures</u>, <u>photographs</u>, or <u>videos</u>, <u>inter alia</u>, of child pornography at issue, and that those pictorial depictions or video recordings of child pornography are "images" themselves, including digital, computer, or computer-generated images. Particularly important for the Court's purpose today, when Congress listed what constituted a visual depiction of child pornography, it stated, in the singular all of those terms: That any one "picture, film, photograph, [or] video" constitutes a digital or computer "<u>image</u>." <u>Id.</u> § 2256(8)(B). By listing the term video next to the terms picture and photograph all in the singular, the statute equates those different ways to depict child pornography as equivalent. Because the statute continues by defining each of these ways to depict child pornography as "images," the logical reading of the text teaches that Congress unambiguously stated that one image can mean one picture, one image can mean one film, one image can mean one photograph, and <u>one image can mean</u> <u>one video</u>. Furthermore, because the Guideline (image enhancement) uses the term "image," which is the same term used in the statute when describing a video or picture as an image, <u>compare</u> U.S.S.G. § 2G2.2(b)(7), <u>with</u> 18 U.S.C. § 2256(5), (8), the Court reads the statute as defining

"image" in the image enhancement to mean one "picture," one "photograph," one "film," and one "video" of child pornography.

Nowhere in the text of the statute nor in the text of the image enhancement did Congress or the Commission provide any evidence of an intention to differentiate between a picture or photograph and a video for the purposes of criminalizing the possession of one "image" of child pornography. Furthermore, nothing in the text of the statute or image enhancement suggests that Congress or the Commission intended to differentiate punishment depending on the length of the video, the abuse depicted therein, or the number of victims or abusers present. Congress knows how to write legislation. It could have defined these terms differently when crafting the statute and when crafting the image table itself. It could have said that one "image" means one picture of child pornography and that each separate scene or frame or 30 seconds of video, for example, in a video equals one image of child pornography. But it did not do so. It equated, by equally listing them, one picture or one photograph with one video.

So too could the Commission have defined image differently in the Guidelines to differentiate between a single picture and a single video. It demonstrated this ability by doing exactly that in the Commentary. But, as Boler and Kisor show, it matters a great deal that the Commission decided, in the Commentary rather than the image enhancement itself, to define one video to equal a

specific number of images (75) for purposes of the enhancement. Altogether, the terminology in the statute and image enhancement, as well as how that terminology is used, demonstrates an unambiguous meaning for the term "image"—that one image, for the purposes of the image sentencing enhancement, means one picture, one photograph, one film, one computer-generated image, and one video.

Definitions contained in some contemporaneously published dictionaries support the conclusion that one image unambiguously means one video. For example, Webster's Collegiate Dictionary defines "image" as a "representation of a person or thing, as a statute, picture, idol, etc." and as the "picture or counterpart of an object produced by a lens, mirror, etc." Image, Webster's Collegiate Dictionary of the English Language (2002). It defines "video" as a "television image or the electric signal corresponding to it." Video, Webster's Collegiate Dictionary of the English Language, supra (emphasis added). Similarly, Random House Webster's College Dictionary defines "image" as the "physical likeness or representation of a person, animal, or thing, photographed, painted, sculptured, or otherwise made visible." Image, Random House Webster's College Dictionary (2000). It defines "video" as the "elements of television, as in a program or script, pertaining to the transmission or reception of the image."

Video, Random House Webster's College Dictionary, supra (emphasis added).

These dictionaries show that "image" contains various means of displaying visual information, which can include inter alia, pictorially, photographically, as a statue, as a painting, or as a recording such as in video form. The definitions of video also suggest that a video constitutes a single "image" rather than containing multiple images. Other dictionaries of the era portray substantially similar understandings and definitions of the term image. E.g., Image, The New Oxford American Dictionary (2001) ("[A] representation of the external form of a person or thing in sculpture, painting, etc. . . . [A] visible impression obtained by a camera, telescope, microscope, or other device, or displayed on a video screen.") (emphasis added); Image, Merriam-Webster's Collegiate Dictionary (2003) ("[T]he optical counterpart of an object produced by an optical device (as a lens or mirror) or an electronic device . . . . [A] visual representation of something as (1): a likeness of an object produced on a photographic material (2): a picture produced on an electronic display (as a television or computer screen)."). However, these same dictionaries do suggest that one video contains multiple "moving visual images." E.g., Video, The New Oxford American Dictionary, supra ("[T]he system of recording, reproducing, or broadcasting moving visual images on or from videotape. [A] movie or other piece of material

32

recorded on videotape.") (emphasis added); Video, Meriam-Webster's Collegiate Dictionary, supra ("VIDEOTAPE [defined as "a recording of visual images and sound (as of a television production) made on magnetic tape"]: "[A] a recording of a motion picture or television program for playing through a television set.") (emphasis added)). Notwithstanding that some of the dictionaries of the era defined "video" as containing multiple "images," the fact that other dictionary definitions of these terms, combined with the fact that Congress's own definitions in the statute, define image to encompass a single video, just as a single picture or photograph, suggests an unambiguous meaning of the term "image" for the purposes of the enhancement: that one image equates to a single video just as it equates to a single picture or a single photograph.

Alongside this textual evidence, the history and purpose of the Guidelines provide further support to the conclusion that the term "image" as used in the image enhancement means a single video of child pornography just as it means a single picture or photograph of child pornography.

Before the image table was added to the Guidelines in 2003, the term "image" never appeared in the Guidelines that addressed child pornography. U.S.S.G. § 2G (2002). The closest text to the modern image enhancement appeared in § 2G2.4, which provided a two-point enhancement if the offense "involved possessing ten or

more <u>books, magazines, periodicals, films, video tapes, or other
items, containing a visual depiction</u> involving the sexual
exploitation of a minor." <u>Id.</u> § 2G2.4(b)(2) (emphasis added). After
Congress enacted the PROTECT Act, the Commission consolidated this
portion of the Guidelines with the modern § 2G2.2 at issue today.
United States Sentencing Commission, <u>The History of the Child
Pornography Guidelines</u> 42-43 (Oct. 2009),
<u>https://www.ussc.gov/sites/default/ files/pdf/research-and-
publications/research-projects-and-surveys/sex-
offenses/20091030 History Child Pornography Guidelines.pdf</u>
[hereinafter <u>Guidelines' History</u>]. The older Guidelines language
almost directly parallels the modern text of the statute defining
the offense of possession. 18 U.S.C. § 2252A(a)(5)(B) ("Any person
who—knowingly possesses, or knowingly accesses with intent to
view, any <u>book, magazine, periodical, film, videotape, computer
disk, or any other material that contains an **image** of child
pornography.</u>" (emphasis added)). In this way, then, the statute
took over the role of defining the punishment itself in terms of
the media that may <u>contain</u> an image or images of child pornography.
Meanwhile, the enhancement's focus shifted from increasing a
defendant's punishment based on the number of <u>media</u> that may
<u>contain</u> "images" (or "visual depictions") of child pornography to
increasing a defendant's punishment on a more granular level based
purely on the number of <u>images</u> themselves that a defendant

possessed. And, as the statutory analysis has confirmed, supra, Congress wrote the statutory definition of visual depictions in a way that unambiguously includes "images" within which both pictures and videos are included.

    The congressional Conference Report accompanying these legislative changes in the PROTECT Act supports this interpretation. In that Report, the Conference noted that Congress was amending the Guidelines so that "penalties are increased based on the amount of child pornography involved in the offense"— meaning, that the image table shifted the enhancement's focus to the number of images of child pornography, rather than the media within which they were found. H.R. Rep. No. 108-66, at 59 (2003) (Conf. Rep.) (emphasis added). The Report went on to further describe how the statutory changes, and the attendant Guidelines changes, were meant to focus on the number of images and that "images" included a "video" for purposes of the image enhancement. It stated that its amendments to the statute "narrow[] the definition of child pornography under 18 U.S.C. § 2256(8)(B) to depictions that are 'digital images' (e.g., picture or **video** taken with a digital camera), 'computer images' (e.g., pictures scanned into a computer), or 'computer-generated images' (e.g., images created or altered with the use of a computer)." Id. at 60 (emphasis added). That description defines "digital images" as used in the statute to mean either a singular picture or a singular

video in equal measure. Consequently, just as one picture
indisputably means one image for the purposes of the enhancement,
so too does one video.

To summarize: Following the enactment of the PROTECT Act and
the placement of the image table in the Guidelines, the Guidelines
no longer focused on increasing punishment based on the number of
books, videotapes, or other media that contain images of child
pornography. The statute itself criminalized that conduct and the
Guidelines applied the same base offense level for it—regardless
of if the defendant possessed one or one hundred books or
videotapes that contained images of child pornography. Instead,
the Guidelines created a tiered-punishment structure (the image
table) that was meant to effectuate the purpose of the statute by
increasing penalties "based on the amount of child pornography
involved in the offense." Id. at 59. Congress decided that the
term "image" was the best way to capture, in numerical form, the
"amount of child pornography" involved in an offense. And, in
creating the image table, and the statutory text enabling it in 18
U.S.C. § 2256(5) and (8), Congress anchored that punishment system
on "'digital images' (e.g., [a] picture or video taken with a
digital camera), 'computer images,' . . . [and] 'computer-
generated images.'" Id. at 60 (emphasis added). This legislative
history and congressional purpose, combined with the statutory
text itself, teach the rather clear lesson that, when the image

36

enhancement uses the term "image," it unambiguously means that term to encompass one entire video of child pornography just as it means it to encompass one picture of child pornography. Therefore, for the purposes of the Guideline's image enhancement, when calculating what level enhancement is appropriate for a defendant, one video must count the same as one picture: Each equals one image.

For Roberts' case, that means that the 127 videos of child pornography that Roberts possessed equates to 127 images. When combined with the 13 pictures of child pornography also in his possession, he possessed 140 "images" of child pornography in total. This puts Roberts in the first tier of the image table. As a result, the Court increased his offense level by two points pursuant to the two-point image enhancement for the possession of between 10 and 149 images of child pornography rather than the PSR's recommended five-points pursuant to the five-point image enhancement for the possession of 600 or more images of child pornography. U.S.S.G. § 2G2.2(b)(7)(A), (D).

As stated, the courts that have addressed this issue—even those that have held that the term "image" is not genuinely ambiguous—have not reached the same conclusion that the Court does today. Indeed, each rejected the defendants' arguments in those cases that a single video equals a single image for purposes of the enhancement. Supra. Respect for the courts that have reached

the opposite conclusion necessitates an explanation for why those views were not persuasive.

That process begins with the decision in Haggerty, wherein the Third Circuit held that the term "image" in the image enhancement was not genuinely ambiguous. Haggerty, 107 F.4th at 183. There, the Third Circuit held that the term "image," when considering its application to the possession of videos of child pornography, means each "frame." Id. Others have reached similar conclusion. E.g., Debus, 688 F. Supp. 3d at 214-15; Phillips, 54 F.4th at 386 (Larsen, J., concurring in the judgment). With respect, an examination of the text, structure, history, or purpose of the enhancement does not support such an interpretation.

As before, the Court begins with an examination of the textual analysis that these courts employ.[10] The Third Circuit began by addressing the defendant's plain-text argument, which was that a "moving image should be quantitatively treated as if it were a still image." Haggerty, 107 F.4th at 183. The court quickly dismissed that argument out of hand, calling it "oxymoronic" because if "'image' needs the modifier 'moving' to accurately

---

[10] The arguments across these opinions are substantially similar. Consequently, although the Court addresses them collectively, it focuses primarily on the Third Circuit's decision in Haggerty. Where appropriate, the Court notes if it is addressing the arguments articulated in other opinions that reached the same conclusion as Haggerty.

describe what is depicted or displayed, then the term 'image' can hardly be equated with the term 'video.'" Id. Fair enough. Roberts makes no such distinction between "moving" and "still" image, and for good reason. As the Third Circuit notes, such a distinction is oxymoronic. Furthermore, no such distinction is necessary because neither Congress nor the Commission differentiated between "moving" or "still" images in the statute or in the enhancement. Instead, as explained previously, supra, the term "image" encompasses both a single video and a single picture based on the statutory definitions used by Congress and a common understanding of the term based on contemporaneously published dictionary definitions. The Third Circuit was correct to reject the arbitrary distinction offered by the defendant, but Haggerty did not address the text that really matters in ascertaining the textual meaning of the term "image."

Having rejected the defendant's meritless plain text argument, Haggerty next moved onto investigating what "image" could mean based on "contemporary dictionary definitions while keeping in mind the whole statutory text, the purpose, and context of the statute and relevant precedent." Id. at 184 (quoting United States v. Mercado, 81 F.4th 352, 356 (3d Cir. 2023) (internal quotation marks and citations omitted)). However, unlike what Haggerty mentioned that it should investigate, and unlike what the Court today analyzed, Haggerty did not "keep[] in mind the whole

statutory text, the purpose, and context of the statute," namely, 18 U.S.C. §§ 2252A, 2256, as it never analyzed that statutory text to glean the meaning behind the term "image" as used in the enhancement. See id. at 183-85. Instead, it skipped that analytical step and started, and largely ended, with an investigation into the common meaning of the word image by examining dictionary definitions published years after the enactment of the PROTECT Act and promulgation of the image table in 2003. Id. at 184.

In particular, Haggerty looked at dictionary definitions of the term "image" from dictionaries published in the years 2009, 2013, 2014, 2022, and 2024. Id. at 184 nn.10-11 (collecting dictionaries). It found that those dictionaries do not support the conclusion that the Court reaches today, namely, that the term "image" means a single video in the video context. However, even for one of these dictionaries (Merriam-Webster), Haggerty did note that its definition of image "might possibly be stretched to include a video, but nowhere does it specifically make space for 'moving' images within the definition." Id. at 184 n.12 (emphasis added). Notably, the Merriam-Webster definition itself parallels closely the other dictionary definitions of "image" on which Haggerty relied.[11] Further, as explained above, the focus on

_____

[11] It also parallels closely the dictionary definitions of the term "image" that the Court relies on today from dictionaries that were published immediately prior to, or shortly after, the enactment of

40

"moving" versus "still" images was misplaced in the textual analysis, but with worse effect in examining the contemporary meaning. When Haggerty took on that approach ("moving" vs. "still") before, it did so because it was the defendant's framing of his textual argument in the case. However, by using the "moving" versus "still" distinction to dismiss out of hand dictionary definitions that supported the conclusion that a video constitutes an image, Haggerty allowed a false assumption to adversely affect its base reasoning. As explained above, there is no reason to rely on the "moving" versus "still" distinction because neither Congress nor the Commission itself made such a distinction. A proper understanding of the meaning of "image," derived both from the authorizing statutory language as well as from the ordinary meaning based on dictionaries published near the time of enactment, supports that an image means either a single picture or video in the context of the image enhancement.

After examining these dictionaries published anywhere between six to twenty-one years after the PROTECT Act and image enhancement were codified, Haggerty did note that other dictionaries that were published closer to the time of the statute and enhancement's codifications accord with its interpretation of "image" derived from those later-published dictionaries. Id. at 184 n.13. True,

_____

the PROTECT Act and the promulgation of the image enhancement. Supra (collecting dictionaries from 2000-2005).

the older dictionaries do not largely deviate from the ones of later years, but all easily support the holding that image equates to a video.[12]

Based on its textual analysis, Haggerty held that the term "image" was not genuinely ambiguous. It went a step further, however, and held that, in the video context, each individual "frame" comprising a video constitutes a single "image" under the image enhancement. Specifically, Haggerty held that "a video inherently contains multiple 'images'" and that an "'image' is a fixed visible representation." Id. at 184. Having determined that an image is a "fixed visible representation," Haggerty took the view that, in the video context, such a representation "is a frame" based on that term's ordinary meaning. Id. at 184-85 (citing Phillips, 54 F.4th at 391 (Larsen, J., concurring in the judgment)). Haggerty states that "Judge Larsen hits the nail on the head when she explains: 'Images means exactly what you'll find in every dictionary—a still representation; and vis-à-vis a video, an image is a frame.'" Id. (quoting Phillips, 54 F.4th at 398 (Larsen, J., concurring in judgment) (internal quotation marks omitted) (emphasis added by the Court)). That adopted a view, first proposed by Judge Larsen of the Sixth Circuit, that has no basis in the text of the enhancement.

_____

[12] Supra (analyzing, e.g., Merriam-Webster's Collegiate Dictionary (2003)).

However, that is simply not what one finds when looking at "every" dictionary definition for these terms. Indeed, in none of the dictionaries examined above did the dictionary define "image" as a "still representation" nor did any dictionary upon which Haggerty relied. Supra. Instead, the definitions of "image" published in dictionaries published near the promulgation of the enhancement rather clearly encompass a video just as some of the dictionary definitions cited in Haggerty.

More problematic is that, to justify its position, Haggerty relies on definitions of the term "frame" from dictionaries published long after the enhancement and statute were codified. Id. at 185 n.14. Some of those definitions do state that a frame is "[o]ne of the set of still images that constitute a film or video." Id. (quoting Frame, The American Heritage Dictionary (2022), https://perma.cc/WUZ9-BVTU (last accessed May 2024)). However, that does not change the fact that the word "frame" is conspicuously absent from the text of the Guidelines generally, the image enhancement specifically, and the statute.

Haggerty could have avoided the leap from "video" to "frame" by examining the text of the statute. But it did not do so. Nowhere in the statute, nor in the image enhancement itself, does the word "frame" appear. 18 U.S.C. §§ 2252A, 2256; U.S.S.G. § 2G. If Congress or the Commission wanted to further differentiate between a single frame of a video and a single video itself for the purposes

of the image enhancement, they could have, and would have, said so. They did not.

Furthermore, nowhere in the definitions of "image" from dictionaries published near the time of image enactment is "image" defined as "still representation" or "frame" when discussing videos or motion pictures. In sum, the view that image means each frame in a video finds no statutory, dictionary, structural, or historical support. What does exist in the statute, and the Conference Report accompanying the PROTECT Act and image table, is the use of the term "image" to include "video" just as it includes "picture." 18 U.S.C. § 2256(8); H.R. Rep. No. 108-66, at 60. This text teaches that the term "image" as used in and for the purposes of the enhancement unambiguously means one entire video, rather than the individual frames that constitute a video, when applied in the video context.

The logical ramifications of the view that each frame of a video equals one image for the purposes of the image enhancement teaches that the view is erroneous. The Sixth Circuit in Phillips addresses these ramifications well. In the majority opinion, the Sixth Circuit states that if "'images' meant 'frames,' then possessing any video would nearly automatically vault the offender to the top of the [image enhancement's five-point] range, thereby obviating the purpose of prescribing different levels" in the image

table. Phillips, 54 F.4th at 383 (emphasis added). The Sixth

Circuit continued:

> For example, assuming a frame rate of 24 flames [sic]
> per second, the penalties would correspond to videos of
> [.42-6.25 seconds for the first tier of the image
> enhancement; 6.25-12.5 seconds for the second tier;
> 12.5-25 seconds for the third tier; 25+ seconds for the
> final tier.] . . . . If a defendant possessed one video,
> the video would need to be just 25 seconds long to
> warrant the maximum increased penalty. And differences
> of only a few seconds lead to vastly different penalties.
> Construing 'image' to mean 'frame' would mean that
> videos are disproportionately counted as compared to
> still images. Not only is there no indication from
> Congress that the intent of the image table was to
> penalize videos to that degree, but the image table's
> precision indicates that Congress sought to vary the
> penalty based on proportionate quantities of images, not
> quarter-second differences.

Id.[13] The Sixth Circuit described the "frame" approach as one that

would "obviat[e] the purpose" of the image enhancement. Id.

---

[13] Below is a reproduction of a table detailing these breakdowns:

| Offense Involves | Enhancement | Video Length (in seconds) |
|---|---|---|
| At least 10 images, but fewer than 150 | 2-level increase | .42-6.25 |
| At least 150 images, but fewer than 300 | 3-level increase | 6.25-12.5 |
| At least 300 images, but fewer than 600 | 4-level increase | 12.5-25 |
| 600 or more images | 5-level increase | 25+ |

Phillips, 54 F.4th at 383 tbl.1.

Consequently, it focused on the ramifications that Judge Larsen's approach would have on the purpose undergirding the enhancement. It did not address the potential textual pitfalls of the "frame" approach, however.

But, an examination of the one-image-per-frame interpretation shows its flaw. One video of <u>less than one second</u> automatically puts an individual into the first tier of the image enhancement. In essence, if an individual possesses <u>any</u> video, the image enhancement automatically triggers. If a person possesses a video of just 25 seconds, the offender is vaulted into the final image enhancement category. In effect, the one-image-per-frame interpretation not only obviates the entire purpose of the image enhancement's tiered structure but it also renders it practically impossible to fall into a lower tier of the image table.[14] There is no indication that Congress intended to sweep with such a broad brush and punish individuals, perhaps who possess only one 25-second video, so significantly.[15] The text does not support that

---

[14] This not only violates the canon of absurdity but so too the rule against surplusage. If an individual in possession of a video of practically any length automatically triggers the maximum level of the image enhancement, then the lower tiers of the image enhancement are rendered inoperable. If a reading of the statutory text would render another portion of the text superfluous, then that interpretation is to be avoided. <u>South Carolina v. U.S. Army Corps of Eng'rs</u>, 66 F.4th 189, 195 (4th Cir. 2023).

[15] Notably, the Commission's Commentary suffers from the same absurd results as the one-image-per-frame interpretation albeit to

Congress unambiguously meant that each frame in a video equals one "image" when these absurd results are the natural consequence of that interpretation.

Haggerty did not address the potential for these absurd results. However, in Phillips, Judge Larsen did address the Sixth Circuit majority's argument regarding these "decidedly unreasonable results." Id. at 394 (Larsen, J., concurring in the judgment) (quoting Id. at 383 (majority opinion)). Judge Larsen observed that the Phillips majority "does not explain its 'decidedly unreasonable results' rule" and notes that the "'absurdity' doctrine, which posits that courts may depart from the text when it would produce 'an outcome so contrary to perceived social values that Congress could not have intended it," is the closest canon of interpretation to what the majority discusses.

---

a slightly less severe degree. Under the Commission's 75:1 Rule, an individual who possesses one video automatically receives a two-point enhancement to their sentencing guidelines range. Possessing two videos automatically triggers the three-point image enhancement. After four videos, the four-point image enhancement triggers. After just six videos, the possessor finds himself receiving the maximum, five-point image enhancement. Again, compare this with someone who possesses pictures of child pornography: One does not receive the two-point enhancement until possessing at least 10 pictures, the three-point enhancement until 150 pictures, etc. Under the Commission's interpretation—as well as the Third Circuit and Judge Larsen's interpretations—it does not matter how gruesome the abusive acts are in those pictures or videos, nor does it matter how many victims or abusers are depicted, nor does it matter how much time within the actual full duration of the video the violence is depicted. All nuance is lost. All that is left is for absurd results to follow.

Id. (quoting id. at 383 (majority opinion); John F. Manning, The Absurdity Doctrine, Harv. L. Rev. 2387, 2390 (2003)) (internal quotation marks omitted).

When applying the absurdity canon in an investigation into the meaning of the text itself, that canon, as Judge Larsen notes, must be applied sparingly—namely, only when it is "obvious to most anyone" that "it is quite impossible that Congress could have intended the result." Pub. Citizen v. DOJ, 491 U.S. 440, 471 (1989) (Kennedy, J., concurring in the judgment). Judge Larsen believes that the text falls short of that high standard and that to employ the canon would result in the Court "simply discarding the text for [its] own policy preferences." See Phillips, 54 F.4th at 394 (J., Larsen, concurring in the judgment) (citing In re Hokulani Square, Inc., 776 F.3d 1083, 1088 (9th Cir. 2015); Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 576 (1982)). Contrary to Judge Larsen's conclusion respecting the absurdity canon, the Court finds that the high bar necessary for application of the canon is met by the frame interpretation. It simply cannot be that Congress intended practically any video of any length to automatically trigger the image enhancement—potentially even at the highest level—when it made explicit tiers as a means of differentially punishing more egregious possessive conduct.

Before moving on to Haggerty's arguments regarding the history and purpose of the enhancement, it is necessary to address

48

other parts of Judge Larsen's concurring opinion in Phillips about the meaning of the image enhancement's text. In her opinion, Judge Larsen also disagreed with the defendant's position that one image equals one video based on the statutory definition of "visual depiction." Id. at 392. In doing so, she agreed with the Sixth Circuit's majority. Id. at 381 (majority opinion). Just as he does not argue that the Court should distinguish between "still" and "moving" pictures, Roberts does not argue that "visual depiction" itself equates to an image like the defendant did in Phillips. So, the Court need not fully address such an argument except to note that it agrees with the Sixth Circuit and Judge Larsen that "visual depiction" is not exactly synonymous with the term "image." Supra. Indeed, Congress stated clearly, in both the statute and Conference Report accompanying the PROTECT Act, that items of child pornography are "images." Those items include pictures, photographs, films, and videos. 18 U.S.C. § 2256(8)(B); H.R. No. 108-66, at 60. By stating that child pornography means "any visual depiction, including any photograph, film, video, [or] picture," Congress listed particular, unique types of visual depictions that are also "images." 18 U.S.C. § 2256(8) (emphasis added). A visual depiction therefore encompasses more than just "images"—and is therefore not synonymous with "image" as the Sixth Circuit and Judge Larsen state. But "images" unquestionably and unambiguously includes pictures and videos in equal measure.

49

After examining the common meaning of the term image, Haggerty next moved to the structure, purpose, and history of the image enhancement, finding that all three provided further support for its conclusion that "image" means "frame" in the video context. Haggerty, 107 F.4th at 185-89. That analysis, too, falls short of supporting its conclusion, however.

That part of Haggerty begins by detailing the history of the Commission's public comment process on interpreting the term "image" and the conclusion it reached as reflected in the Commentary's 75:1 Rule. Id. at 185-87. Then, as this MEMORANDUM OPINION has stated, supra, Haggerty turned to the history of changes to the text of the image enhancement from 2002 to 2003; specifically, the combination of the old U.S.S.G. §§ 2G2.2 and 2G2.4 into the modern § 2G2.2.

Haggerty notes that § 2G2.4 of the 2002 Guidelines "increased the defendant's offense level by two points if the offense involved 'ten or more . . . video tapes . . . containing a visual depiction involving the sexual exploitation of a minor.'" Id. at 187 (quoting U.S.S.G. § 2G2.4(b)(2) (2003)). According to Haggerty, the later consolidation of the Guidelines into the modern image table, demonstrates that "Congress made clear that the number of videos would no longer be the focus. Instead, to further the PROTECT Act's goal of increasing punishment 'based on the amount of child pornography involved in the offense,' the severity of an

enhancement would be tied to the number of images involved.'" Id. (quoting H.R. No. 108-66, at 59). That incorrect conclusion is reached, however, by erroneously equating a "video tape" from the old version of the Guidelines to a "video" under the modern statute.

As already explained supra, the old version of the enhancement punished offenders based on the number and type of media that contained images of child pornography, including "books, magazines, periodicals, films, video tapes, or other items." U.S.S.G. § 2G2.4(b)(2) (2002). By leaving out the rest of the text of the old enhancement, the Third Circuit misses the key context of the list that the term "video tape" resides in; namely, all of the words in that list are types of media that "contain" images of child pornography. Id.; see also H.R. No. 108-66, at 60. So, as Haggerty concludes, it was not that Congress switched its focus from "videos" to "images." Haggerty, 107 F.4th at 187. Instead, Congress switched from focusing on media that contained images (like books and video tapes) to the very images themselves (such as pictures and videos, as the statute describes). Consequently, an interpretation that counts a single video as a single image better reflects those historical changes and captures Congress's purpose of increasing the punishment "based on the amount of child pornography involved in the offense," H.R. No. 108-66, at 59,

better than the one-image-per-frame interpretation that lacks support in the text and history of the image enhancement.

Haggerty also disregards the Sixth Circuit majority's concerns that the one-image-per-frame would lead to unreasonable results, or what this Court has deemed would violate the absurdity canon. To that end, Haggerty states that "it is not [its] role as a court to subordinate an inquiry into the plain meaning of a congressionally imposed Guideline to subjective concerns about the severity of a sentence that results from the application of that Guideline." Haggerty, 107 F.4th at 187. Instead: "Severe though resulting sentences may appear, § 2G2.2(b)(7) reflects a policy decision made by Congress—and the making of policy is solely within the province of the legislative branch." Id. There is irony in that observation when one considers that nowhere in the text of the statute, image enhancement, or contemporaneously published dictionaries; nor in the structure, history, or purpose of the image enhancement is there support for a one-image-per-frame interpretation.

It is true that a court's job is not to make policy. But courts also must guard against readings of the text of a statute, or in this case, the text of the Guidelines, that would be unquestionably absurd. Lara-Aguilar v. Sessions, 889 F.3d 134, 144 (4th Cir. 2018) ("[Courts must] avoid 'interpretations of a statute which would produce absurd results . . . if alternative

interpretations consistent with the legislative purpose are available . . . However, a statutory interpretation that produces surprising or anomalous results is not the same as one producing absurd results. Indeed, to 'truly be characterized as absurd,' the interpretation of a statute must result in an outcome 'that is so gross as to shock the general moral or common sense.'" (quoting Grifin, 458 U.S. at 575; Sigmon Coal Co. v. Apfel, 226 F.3d 291, 304 (4th Cir. 2000) (alteration in original))). The Court avoids those absurd results today by employing this canon and not interpreting the term "image" in a way that would equate every frame of a video as a single image for purposes of the image enhancement.

The Court has pulled from all available resources and used "all the standard tools of interpretation" in its toolbox to examine the "text, structure, history, and purpose" of the enhancement at issue today. Kisor, 588 U.S. at 573, 575; Boler, 115 F.4th at 322-23. That examination has led to the conclusion that the term "image" is not genuinely ambiguous when considering its application to the context of an individual possessing videos of child pornography. In that context, it would "shock the general moral or common sense," Sessions, 889 F.3d at 144, to construe "image" to mean each individual "frame" of a video. Instead, the text, structure, history, and purpose of the image enhancement all support an understanding that the term "image" means an entire

video itself such that if a defendant possesses one video, he possesses one image for the purposes of the image enhancement in U.S.S.G. § 2G2.2(b)(7).

For the foregoing reasons, the Court SUSTAINED Roberts' OBJECTION to the application of the five-point image enhancement to him for his possession of over 600 images. Instead, only the two-point image enhancement for the possession of between 10 and 149 images is warranted. That is because Roberts possessed only 140 images in total—13 pictures and 127 videos. Because the Court decides that the text of the statute is not genuinely ambiguous, the Court need not assess whether the Commission's interpretation of that text is reasonable. However, because of the various opinions splintering on this issue in the circuit courts, and because the Fourth Circuit has not decided the issue, the Court believes that it is appropriate to conduct a full Kisor analysis, including this second step. Karsten, 36 F.3d at 11-12. The Court now addresses that reasonableness issue.

## B. The Commentary Interpreting U.S.S.G. § 2G2.2(b)(7) Is Unreasonable.

When assessing whether an agency's interpretation of regulatory text, here, "image," is reasonable—or, in other words, whether the interpretation falls within the "zone of ambiguity"— the Court asks whether the "commentary falls 'within the bounds of reasonable interpretation.'" Boler, 115 F.4th at 327 (quoting

Kisor, 588 U.S. at 576; United States v. You, 74 F.4th 378, 398 (6th Cir. 2023)). Only after the Court finds that the Commentary falls within the "reasonable bounds" of interpretation, should it "independently inquire as to whether the commentary's 'character and context' entitles it to 'controlling weight.'" Id. at 328 (quoting Kisor, 588 U.S. at 576). In that third step of the analysis, the Court considers three factors, including whether the "commentary is the Commission's 'official position,' 'implicate[s] its substantive expertise' in some way, and reflects the 'fair and considered judgment' of the Commission such that it is not simply a 'convenient litigating position.'" Id. (quoting Kisor, 588 U.S. at 577-79 (alteration in original)).

The interpretive Commentary that the Court assesses for reasonableness reads as follows:

> **Determining the Number of Images.**—For purposes of determining the number of images under subsection (b)(7):
>
> * * *
>
> (ii) Each video, video-clip, movie, or similar visual depiction shall be considered to have 75 images. If the length of the visual depiction is substantially more than 5 minutes, an upward departure may be warranted.

U.S.S.G. § 2G2.2(b)(7) Comment., n.6(B)(ii) (emphasis added). The Commission added this Commentary shortly after Congress enacted the PROTECT Act and the Commission, at Congress's directive, placed the image table into the Guidelines. After the image table was

promulgated, the Commission solicited public comments on how to interpret the term "image" because, as the Commission asserted, the "PROTECT Act did not . . . define what constitutes an 'image' for purposes of applying these new 'image tables.'" Sentencing Guidelines for United States Courts, 68 F. Reg. 75340, 75353 (Dec. 30, 2003). The Commission inquired how it should "decide how to count images," and, specifically, how it should consider "videos, films, or AVI files . . . For example, if a video includes numerous scenes, each of which portrays the same minor engaging in sexually explicit conduct with a different adult, is each scene with a different adult to be considered a separate image?" Id.

From that notice for public comment, the Commission received various comments from interest groups, including the U.S. Department of Justice ("DOJ") and the Federal Public and Community Defenders Office ("FDO"), on how it should interpret the term "image" in the video context. Guidelines' History, supra at 43. The FDO suggested to the Commission in 2003 that the term image should be defined as "a single item such as one photograph or video rather than by reference to each frame in a video or each person depicted." Id. The Federal Defenders argued that this proposal is a "more common-sense definition and thus more readily comports with notice requirements of due process particularly as these factors are applied based on a preponderance of reliable 'hearsay.'" FDO, Written Testimony of Jon Sands to the U.S. Sent'g

Comm'n,         at         8         (Mar.         17,         2004),

https://www.ussc.gov/sites/default/files/pdf/amendment-

process/public-hearings-and-meetings/20040317-

19/FPDComment31704.pdf. Furthermore, the FDO argued that its

proposed definition was "more appropriate as it pertains to a

factor that does not necessarily measure culpability with

sufficient precision to support a broader definition." Id.

The DOJ disputed that position, arguing that any definition

that "treated a video/movie and a still image as both being one

image . . . would be arbitrary." Guidelines History, supra at 43

(quoting Letter from DOJ, Deborah J. Rhodes, Counselor to the

Assistant Attorney General, to the U.S. Sentencing Commission, at

2 (Mar. 1, 2004)). However, other than a short statement—"[a]

video/movie that contains even one second of sexually explicit

conduct is a more serious item than a still image," Letter from

DOJ, supra, at 5—the DOJ did not elaborate on why it believed the

FDO's proposed definition of "image" would be arbitrary. Instead,

the DOJ argued that "each moving image [should] be subject to a 2-

or 3-level enhancement." Guidelines' History, supra, at 43. Unlike

Haggerty and Judge Larsen, however, the DOJ also dismissed out of

hand that "image" should equate to each frame of a video. Id. at

43 n.201.

Ultimately, the Commission rejected the recommendations of

both the DOJ and FDO. It also seemingly rejected the underlying

premise of its question posted for public comment: That each "scene" in a video be counted as a single "image." Instead, the Commission determined that "because each video contained multiple images[,] it should be counted as more than one image." Id. at 43. From there, because the "image table enacted by Congress assigned a 2-level increase for between ten images and 150 images, and a 3-level increase for 150 to 300 images, the Commission adopted a definition of video that considered each video to contain 75 images, squarely in the middle of the 2-level increase range." Id. at 43-44 (emphasis added).

Aside from being "squarely in the middle of the 2-level increase range," id., the Commission seems to not have provided any additional reasoning[16] for its interpretation that one video equals 75 images for the purposes of the image enhancement. So, from this justification alone, the Court must determine whether the Commission's interpretation of the enhancement is reasonable. The Court cannot make such a finding for two reasons.

First, aside from being unreasonable, the Commission's interpretation is just plain wrong as a function of mathematics. Simply put, 75 is not, as the Commission states, "squarely in the middle of the 2-level increase range." Id. That "2-level increase range" enhances a defendant's Base Offense Level by two points

---

[16] Certainly, neither the parties to this case nor the Court has located any further explanation.

when they possess between 10 and 150 images (technically, between 10 and 149). U.S.S.G. § 2G2.2(b)(7)(A). However, under the Commission's justification, it would have interpreted image to equal 70 images (technically, 69.5) rather than 75 images in the video context because the exact midpoint between 10 and 150 is 70, not 75. The Commission's interpretation, at least on a mathematical level, would have been correct if it based that interpretation on the midpoint of the 3-level increase range, which imposes a three-point increase in a defendant's Base Offense Level upon possession of between 150 and 300 images, id.; however, as the Commission itself stated, that is not the basis upon which the Commission made its interpretation. Guidelines' History, supra at 43-44.

Second, and more importantly, even had the Commission's interpretation been mathematically accurate (70, rather than 75 images per video), the ratio lacked any record or analytical support. To put it simply, the Commission provided no real reasoning for its conclusion that one video equals 75 images. The fact that the number 75 is "squarely in the middle" of one of the prescribed enhancement ranges is meaningless to what Congress intended "image" to mean in the video context. Haggerty took the view that: "[T]he Commission's decision-making process reflects its desire to achieve a compromise. In the legislative process, compromise is often essential to reaching a result. Yet no matter how salutary this compromise may have been in reaching a consensus,

it was not an exercise in interpretation." Haggerty, 107 F.4th at 186-87 (emphasis added).

For these reasons, the Court concludes, as did Haggerty and Judge Larsen, that the Commission's 75:1 ratio does not fall "within the bounds of reasonable interpretation" of the enhancement. Boler, 115 F.4th at 327 (quoting Kisor, 588 U.S. at 576 (internal quotation marks omitted)). Because that interpretation is unreasonable, the Court cannot defer to the Commentary.

The Sixth and Eleventh Circuit Courts of Appeals have reached a different conclusion. Both have held that the term "image" is genuinely ambiguous and that the Commission's interpretation of that ambiguity—equating one video to 75 images—is reasonable. Because those Courts found that the Commission's interpretation was reasonable, they deferred to that interpretation and affirmed the district courts' imposition of the enhancement on the respective defendants. As was the case when considering whether "image" was genuinely ambiguous, the Court also finds it necessary to address the opposing positions of the Sixth and Eleventh circuits.

Of the circuits that have held that the Commission's 75:1 ratio is reasonable, the Sixth Circuit's opinion in United States v. Phillips, 54 F.4th 374, is by far the most analytically rigorous. In that opinion, the Sixth Circuit looked to the same

justifications made by the Commission that this Court examined and found that the Commission's interpretation was reasonable because that interpretation "acknowledged the disproportionate results that would occur if it adopted either [the] one-video-one-image calculation or a one-frame-one-image calculation." Id. at 384. In the Sixth Circuit's view, the Commission's interpretation:

> [E]nsure[s] that Congress's precise delineation [in the tiers of the image table] would be meaningful. The 75:1 Rule takes into account the text, acknowledging that a video is comprised of multiple images, as both terms are commonly understood. It also takes into account the history and structure of the image table; that is, the scale of the differentiation—10 to 600—such that Congress's choice of those figures would have real-world consequences.

Id. (emphasis in original). The Sixth Circuit made sure to note that it was not holding that "the Commission could have picked any number out of a hat." Id. at 385. Instead, it merely held that the Commentary was reasonable because it "considers (1) the fact that videos contain multiple images; (2) the image table's purpose of tying offense levels to the number of images; and (3) Congress's choice to create four different tiers of punishment, based on a scale of 10 to 600 images." Id.

The Court does not find the reasoning of Phillips persuasive for several reasons. First, it is unclear, as Phillips argues, that the Commission's interpretation truly avoids "disproportionate results" that the court believes would necessarily result from either a "one-image-one-video" or a "one-

61

image-one-frame" interpretation. Under Phillips' (and the Commission's) understanding, Congress left the term "image" genuinely ambiguous as it relates to videos. True, Congress did not directly define an image as a video in the image table itself;[17] however, Congress likewise never laid out a structure of punishment—in either the statute or image enhancement—that suggested it viewed it more prudent to impose greater punishment on the possession of videos rather than pictures of child pornography. Indeed, in the statute that undergirds the image enhancement at issue, Congress defines, in the same list, that a picture, photograph, or video (all in the singular) constitutes child pornography, 18 U.S.C. § 2256(8), and later further defines those media as "visual" or "digital" images deserving of punishment. Id. § 2256(8)(B). Similarly, as Congress explained in the Conference Report to the PROTECT Act, although Congress was attempting to ensure that "penalties are increased based on the amount of child pornography involved in the offense," H.R. Rep. No. 108-66, at 59, Congress gave no indication that it was looking to impose different, let alone greater, punishments on defendants who possess videos of child pornography compared to pictures or

---

[17] When one considers the image enhancement's text alongside the text of the statute, as the Court has done supra, it is clear, however, that Congress unambiguously meant that one image equals both one picture and/or one video for the purposes of the image enhancement.

photographs of child pornography. Afterall, in that same Report, Congress noted that it was "narrowing the definition of child pornography under 18 U.S.C. § 2256(8)(B) to depictions that are 'digital images' (e.g., picture or **video** taken with a digital camera)" among others. Id. at 60 (emphasis added). By listing "video" alongside "picture" both in the singular, the language of that Report teaches that Congress itself viewed a single picture to equal a single video.

Without any indication by Congress on what a "disproportionate result" would be if a video or picture was treated differently for the purposes of the image enhancement, it is difficult to justifiably accept that an interpretation that one video equals 75 images avoids such imaginary "disproportionate results." Perhaps, in fact, it may create them. Pursuant to the Court's reading of the image enhancement and statute today, a defendant possesses one "image" of child pornography for the purposes of the image enhancement if he possesses one picture of it—likewise if he possesses one video. However, under the Commission's Commentary, that defendant can possess either one image of child pornography (if a picture) and have the image enhancement not apply, or, he could possess 75 images of child pornography (if a video), which, after only one video would trigger the first tier of the image enhancement. Indeed, under the Commission's interpretation, the image enhancement automatically

applies—without any consideration of the duration or depictions in the video—to the defendant if he possesses a single video of child pornography, but it would not apply to him if he possesses up to nine pictures or photographs of child pornography. U.S.S.G. § 2G2.2(b)(7). This may cause a defendant who possesses one video of child pornography to receive years more on his sentence than a defendant who possesses up to nine pictures of child pornography. That is so regardless of the brutality depicted in those media, the number of victims or abusers, or the duration of the video. Just as Congress did not meaningfully differentiate between a video of child pornography or a picture of child pornography in the image enhancement or the statute, it did not express any intent that it wanted to punish those who possess videos more than those who possess pictures of child pornography. And, common sense suggests that, had Congress intended to differentiate to this degree, it would have said so and done so according to more finely tuned parameters such as the duration of the video in question or what was depicted therein.

Congress may believe that a defendant who possesses nine pictures of child pornography, perhaps with nine distinct child victims, deserves a heftier punishment than a defendant who possesses a single video of child pornography with one victim (not even delving into the separate issues of the duration of the video and how much of that duration portrays the actual child

pornography). That decision, however, should be left to the Legislative Branch. The Court lacks sufficient evidence from the image enhancement and statute, as well as the history, purpose, and structure of those texts, to determine what type of possession Congress would want to punish more—or even if Congress would want to punish one type of possession more than the other. Therefore, the Sixth Circuit's finding that the Commission's interpretation is reasonable because it avoids "disproportionate results"—without any textual, structural, or historical support to demonstrate that Congress expressed such an intent—is merely judicial policymaking disguised as judicial deference to the Commission's own unjustified policymaking.

Second, for these same reasons, Phillips' other justifications for its holding, namely that the interpretation reasonably considers the "image table's purpose of tying offense levels to the number of images" and that Congress chose to "create four different tiers of punishment, based on a scale of 10 to 600 images," fails. Phillips, 54 F.4th at 185. Congress gave no indication that it intended to impose a five-point enhancement, which would undoubtedly ratchet up a defendant's sentence by years, on a defendant who possessed only six videos of child pornography (whether they be one second or one hour). Meanwhile, a defendant who possesses six pictures of child pornography would not have his sentence enhanced at all. Rather than attempting to create a system

that accords with Congress's text, intent, history, and purpose, the Commission's interpretation effectively dismantles the tiered-based punishment system that Congress created in the image table because it has the potential to treat, and in reality does result in treating, possessors of child pornography substantially differently, or, in other words, <u>disproportionately</u>.

Third and last, <u>Phillips</u>' analysis upholding the Commission's interpretation fails because it created, and then relied upon, justifications for the Commission's interpretation that the Commission itself did not rely on. The Commission rejected the "one-image-one-video" and "one-image-one-frame" interpretations without any mention of the potential disproportionate results that would follow if it adopted one of those interpretations. Instead, it did so based on the, unproven and unjustified, belief that "each video contain[s] multiple images" so that it "should be counted as more than one image" and because 75 images rested "squarely in the middle of the 2-level increase range." <u>Guidelines' History</u>, <u>supra</u> at 43-44. As explained above, however, the Commission's base presumption that a video necessarily contains more than one image is inappropriate based on the statutory and plain-meaning definitions of the term "image." <u>Supra</u>. Furthermore, the Commission's second justification is just plain incorrect—the midpoint between 10 and 150 is 70, not 75. <u>Supra</u>. The Commission's reasonings for its interpretation do not accord with the statements

in _Phillips_ about the Commission's reasonings. Instead, _Phillips_'
analysis creates _ad hoc_ justifications to make the Commission's
interpretation _seem_ reasonable, when it truly lacks any basis in
reason.

Finally, the Commission's interpretation essentially amounts
to a nonlegislative compromise over the meaning of regulatory text
(though, that text was written by Congress). _Phillips_, 54 F.4th at
387-88 (Larsen, J., concurring in the judgment); _Haggerty_, 107
F.4th at 186-87. The Commission's use of the phrase "[e]ach video,
video-clip, movie, or similar depiction _shall be considered_ to
have 75 images" is the language of policymakers, not interpreters.
_Phillips_, 54 F.4th at 388 (Larsen, J., concurring in the judgment)
(quoting U.S.S.G. § 2G2.2 Comment., n.6(B)(ii) (emphasis in
original)). The Commission's terminology in the Commentary does
not sound in interpretation and, therefore, it lacks the character
of interpretation. Instead, it is policymaking by an entity not
imbued with policymaking power. Consequently, the language of the
Commentary cannot be said to be a "reasonable" form of
interpretation that warrants judicial deference under _Kisor_.

For all of these reasons, the Court disagrees with the
reasoning and conclusion of _Phillips_ that the Commission's 75:1
ratio interpreting the meaning of the term "image" in the video
context is reasonable.

In four unpublished opinions, the Eleventh Circuit has also held that the Commission's interpretation of the term "image" is reasonable. United States v. Peralta, No. 23-13647, 2024 U.S. App. LEXIS 27422, 2024 WL 4603297, at *2 (11th Cir. Oct. 29, 2024) (per curiam) (unpublished); United States v. Carmody, Nos. 22-13539, 22-13542, 2023 U.S. App. LEXIS 28315, at *5 (11th Cir. Oct. 25, 2023) (per curiam) (unpublished); United States v. Vandyke, Nos. 23-11268, 23-11794, 2024 U.S. App. LEXIS 3017, *10-11 (11th Cir. Feb. 9, 2024) (per curiam) (unpublished); United States v. Blanc, No. 22-14128, 2025 U.S. App. LEXIS 7063, at *20-21 (11th Cir. Mar. 27, 2025) (per curiam) (unpublished) The arguments in these cases are substantially less developed than the Sixth Circuit's opinion in Phillips. None of them persuade the Court to reach a different decision than it does today. Nonetheless, the Court briefly addresses them.

First, in Peralta, the Eleventh Circuit simply rehashes the same arguments, verbatim, as Phillips and quotes from, and refers heavily to, that decision. Peralta, 2024 WL 4603297, at *2. Nothing in that opinion strikes the Court as unique reasoning distinct from that in Phillips. Therefore, the Court rejects the reasoning in Peralta for the same reasons that it declines to adopt the decision in Phillips.

Second, in Vandyke, the Eleventh Circuit employed the Kisor analysis, but placed the burden of proof on the defendant. Vandyke,

2024 U.S. App. LEXIS 3017, at *10 ("Because a video comprising multiple images plainly is not a single image, Vandyke fails to establish that the guideline is unambiguous."). The Eleventh Circuit decided that it "need not address" the second Kisor prong (reasonability) because "Vandyke's only proposed interpretation— that [it] count each video as one image—is plainly unreasonable. And Vandyke fails to explain how any other method of counting all the images contained within the 63 videos he is responsible for would not result in the application of the same five-level enhancement for the involvement of at least 600 images." Id. at *10-11 (citing Fed. R. Crim. P. 52(a); United States v. Olano, 507 U.S. 725, 735 (1993)). In the Fourth Circuit, however, it is the United States' burden to prove that the Court should apply the sentencing enhancements recommended by the PSR. Reyna, 336 Fed. App'x at 354 (citing Kiulin, 360 F.3d at 460). Because the Eleventh Circuit placed the burden of proof on the defendant in Vandyke, it did not fully consider any other arguments for whether the Commission's interpretation of the enhancement is reasonable. It would be inappropriate to attempt to speculate how the Eleventh Circuit would have conducted that analysis.

Third, in Carmody, the Eleventh Circuit does articulate two separate bases for why it views that the Commission's interpretation of "image" is reasonable. First, it stated that, "because the statues [sic] that Congress relies on to define

'images' lists [sic] various image formats but fail to indicate how each format should be tallied, it was necessary for the Sentencing Commission to develop a method to calculate the number of images contained in a video." Carmody, 2023 U.S. App. LEXIS 28315, at *5. Second, it viewed the Commission's interpretation as a "'fair and considered judgment' that does not unjustly penalize offenders'" after considering the United States' expert witness who testified to how a single video (of 5 minutes and 43 seconds) would equal 8,575 images under a one-image-one-frame interpretation. Id. at *5-*6 (quoting Kisor, 588 U.S. at 579). The first reason in Carmody has been fully addressed and will not be repeated. Supra. As Carmody's second argument, such considerations of the Commission's "fair and reasonable judgment" should only come into the Court's consideration if it first finds that the interpretation is in the "zone of ambiguity." It is not part of that initial reasonableness inquiry, operating, instead, as a failsafe to disallow some reasonable agency interpretations to receive deference. Kisor, 588 U.S. at 578-80. The Court addresses such arguments infra.

Fourth and last, in Blanc, the Eleventh Circuit did not provide much reasoning at all in its conclusion that the Commentary is reasonable. It noted that the language of the image enhancement does not define the term "image" and that there exists a circuit split among the Third and Sixth Circuits on the issue. Blanc, 2025

U.S. App. LEXIS 7063, at *20-21. It also noted that multiple panels of the Eleventh Circuit had already decided the issue. Id. at *20 n.3. Ultimately, it held that "[g]iven the legal landscape about the 75:1 ratio prescribed by the commentary to § 2G2.2(b)(7),[the defendant] cannot show that any error committed by the district court was plain." Id. at *21. Because Blanc does not present any additional justifications for holding that the 75:1 ratio is reasonable, the Court does not find it useful for its analysis.

Finding none of these cases sufficiently persuasive to conclude that the 75:1 ratio is reasonable, the Court reiterates its holding that the 75:1 ratio in the Commentary to U.S.S.G. § 2G2.2(b)(7) is an unreasonable interpretation of the image enhancement that is not due judicial deference pursuant to Kisor and Boler.

## C. The Commentary Interpreting U.S.S.G. § 2G2.2(b)(7) Does Not Receive Judicial Deference.

The Court has thus far held that the text of the image enhancement is not genuinely ambiguous and, even if that text was genuinely ambiguous, that the 75:1 ratio in the Commentary is an unreasonable interpretation of the enhancement such that it does not warrant judicial deference. Supra. Those holdings, standing alone, are sufficient to dispose of this case. However, because of the burgeoning dispute among the federal courts on this issue, the Court believes it necessary to pursue the analytical requirements

of Kisor and Boler to their conclusion. Thus, for this portion of its analysis, the Court presumes that the 75:1 ratio is a reasonable interpretation of the image enhancement to decide whether that interpretation warrants judicial deference.

The final analytical step under the Kisor and Boler framework requires the Court to investigate whether reasonable interpretations of the Commission's genuinely ambiguous guidelines do, in fact, warrant judicial deference. Kisor, 588 U.S. at 577-79; Boler, 115 F.4th at 323. The Supreme Court has instructed that courts should only defer to those reasonable interpretations "that Congress would have wanted" based on an "independent inquiry into whether the character and context of the [Commission's] interpretation entitles it to controlling weight." Kisor, 588 U.S. at 576. To determine if the "character and context" of the interpretation warrants judicial deference, the Court must determine whether: (1) the interpretation is the "official position" of the Commission; (2) the interpretation implicates the Commission's "substantive expertise"; and (3) the interpretation reflects the "fair and considered judgment" of the Commission. Id. at 577-79. Although this test is not exhaustive, if the Court finds that those three factors are met, then deference to the interpretive Commentary is warranted. Although the first two factors have been met, the third has not. Therefore, even if the

75:1 Rule was a reasonable interpretation, it does not deserve deference.

First, the Commission provides the 75:1 Rule as part of the Commentary to the image enhancement. U.S.S.G. § 2G2.2(b)(7) Comment., n.6(B)(ii). The Commission's Commentary to the Guidelines is unquestionably the "official position" of the agency. See Boler, 115 F.4th at 328; see cf. United States v. Wiley-Dunaway, 40 F.3d 67, 71 (4th Cir. 1994) (stating that, under the abrogated Stinson standard, the "Sentencing Commission's policy statements and commentary are generally entitled to treatment as authoritative guides with controlling weight, unless inconsistent with a statute or the Sentencing Guidelines themselves"). Therefore, the 75:1 Rule is the "official position" of the Commission and the first factor has been met.

Second, in the past, several courts within the Fourth Circuit, including this Court, had held that "Section 2G2.2—the child pornography Guideline—is not entitled to the usual deference due the Guidelines" because, unlike other guidelines "grounded in empirical analysis," § 2G2.2 is "not grounded in empirical analysis, but rather on statutory directive." United States v. Cruikshank, 667 F. Supp. 2d 697, 702 (E.D. Va. 2009) (citing Gall v. United States, 552 U.S. 38 (2007)); e.g., United States v. McCracken, 667 F. Supp. 2d 675, 678 n.5 (W.D. Va. 2009) (collecting cases). However, the Fourth Circuit later rejected that view and

instructed courts "to give respectful attention to Congress'[s] view that [child pornography crimes] are serious offenses deserving serious sanctions." United States v. Strieper, 666 F.3d 288, 295-96 (4th Cir. 2012) (quoting United States v. Morace, 594 F.3d 340, 347 (4th Cir. 2010) (internal quotations and citation omitted) (alterations in original)). In light of these developments, the Court views the 75:1 ratio in the Commentary as based on the Commission's substantive expertise of prescribing punishments for child pornography cases. Indeed, since those earlier cases were decided, the Commission has amended § 2G2.2 and its Commentary multiple times. Amendment 733, U.S.S.C., https://www.ussc.gov/guidelines/amendment/733 (last visited June 11, 2025); Amendment 736, U.S.S.C., https://www.ussc.gov/guidelines/amendment/736 (last visited June 11, 2025); Amendment 801, U.S.S.C., https://www.ussc.gov/guidelines/amendment/801 (last visited June 11, 2025). Also in this time, the Commission has published several reports regarding § 2G. Guidelines' History, supra; United States Sentencing Commission, Federal Sentencing of Child Pornography: Non-Production Offenses (June 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf. Overtime, the Commission has demonstrated and developed its "substantive expertise" in this area such that the Court can

74

reasonably conclude that the 75:1 ratio in the Commentary was based upon and informed by that expertise. See Kisor, 588 U.S. at 579; Boler, 115 F.4th at 323. Therefore, the second factor has been met.

Third, the interpretive Commentary must reflect the "fair and considered" judgment of the Commission to warrant judicial deference. Kisor, 588 U.S. at 579; Boler, 115 F.4th at 323. It does not do so. As explained above, the Commission devised the 75:1 ratio because it was purportedly "squarely in the middle of the 2-level increase range." Guidelines History, supra at 43-44 (emphasis added). However, that is mathematically incorrect. The "2-level increase range," or, the range proscribed by the two-point enhancement, is for offenders who possess at least 10 but fewer than 150 "images" of child pornography. The midpoint of that range would be 70 full images (or, 69.5 images if considering "half" images to the extent possible), not 75. U.S.S.G. § 2G2.2(b)(7)(A). It is difficult to say that the Commission's judgment in support of the 75:1 ratio is "fair and considered" when it incorrectly applied the laws of simple division. Other than the Commission's (faulty) mathematical reasoning, it provided no other reasoning justifying the 75:1 ratio aside from its bald assertion that "because each video contained multiple images[,] it should be counted as more than one image." Guidelines' History, supra at 43. It did not do any of the interpretive work, however,

that would show how or why a video necessarily contains multiple "images" for purposes of the image enhancement. Indeed, as Haggerty put it, "the Commission's decision-making process reflects its desire to achieve a compromise. In the legislative process, compromise is often essential to reaching a result. Yet no matter how salutary this compromise may have been in reaching a consensus, it was not an exercise in interpretation." Haggerty, 107 F.4th at 186-87 (emphasis added). Rather than engaging in a practice of regulatory interpretation based on its substantive expertise in the area, the Commission's reasoning and justifications (or lack thereof) for the 75:1 ratio essentially take the form of administrative fiat. Debus, 688 F. Supp. 3d at 215. They do not represent the "fair and considered" judgment of the Commission and therefore do not deserve judicial deference. Kisor, 588 U.S. at 579; Boler, 115 F.4th at 323.

## IV. CONCLUSION

For the foregoing reasons, the Court SUSTAINED Roberts'
OBJECTION, ECF No. 24, to the PSR's imposition of the five-point
image enhancement pursuant to U.S.S.G. § 2G2.2(b)(7)(D) and,
instead, imposed the two-point image enhancement pursuant to
U.S.S.G. § 2G2.2(b)(7)(A) for his possession of 140 "images" of
child pornography.


It is so ORDERED.


_____ /s/    _REP_____

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: June _16_, 2025